2020 UT App 87

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID BRUCE BUTTARS,
Appellant.

Opinion
No. 20170436-CA
Filed June 4, 2020

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 131901512

Alexandra S. McCallum, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

ORME, Judge:

¶1 David Bruce Buttars appeals his convictions on four counts of securities fraud and one count of pattern of unlawful activity. Among other things, Buttars argues that the district court erred in admitting his bank records under the residual exception of rule 807 of the Utah Rules of Evidence. We reverse and remand for a new trial.

BACKGROUND[1]

*Ellipse and MovieBlitz*

¶2     In 2005, Buttars and a business partner (Partner) created a company called Ellipse Technology (Ellipse). Ellipse was a "startup" that attempted to create kiosks where customers could "take a memory key similar to a USB . . . and download . . . movie[s] or any other media content," "take it home, watch it on a playback device, and then never have to return it again." Buttars and Partner each owned 50% of the company, with Buttars acting as CEO and Partner as president. For about two years, both Buttars and Partner worked for Ellipse full time and drew a salary. Other individuals were subsequently brought in to assist with research and development, fundraising, and other corporate responsibilities, but Buttars remained in control.

¶3     Buttars, an electrical engineer, was the "brains" behind the project. He was "in charge of fundraising," managing the finances, establishing "relationship[s] with the investors," and developing the kiosk and USB technology. As CEO, Buttars was essentially "over everything," and from the start it "was made very clear" that he was the "top decision maker" and "in charge."

¶4     Buttars's home served as Ellipse's corporate headquarters. It was equipped with an email server and a phone system, and it contained a room in the basement that was used for weekly meetings. It was also common for visitors on Ellipse-related business trips to stay at the home.

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶5    In 2007, after Ellipse raised more than $600,000 from approximately 50 individual investors, Ellipse's legal counsel advised the company that it "had too many individual, non-accredited investors" and that it should instead focus its fundraising efforts "on accredited or institutional investors" with "significant financial reserves." Buttars discussed this advice with Partner and others in the company, "[a]nd it was understood that money could no longer be raised . . . the way it had been." Subsequently, from 2007 to 2008, a number of interested institutional investors made offers in the millions-of-dollars range in exchange for significant shares of the company. Partner and others involved with Ellipse wanted to accept the offers, which would have provided sufficient funding to have gotten Ellipse "to a true product, one that was actually functional and that [they] could go beta with."[2] Ultimately, however, the offers "were all rejected" because Buttars, as the one "in charge," "said he didn't want to do it."

¶6    Late in 2008, Buttars involved his friend (Friend) in Ellipse because Friend "claimed to have access to large amounts of institutional funding overseas," which claim turned out to be false. Friend was made a board member and executive of Ellipse. Ellipse then funded a trip to Switzerland for Friend to secure funding, but the funding did not materialize.

¶7    With no institutional investors on board, Ellipse was soon in need of funding and, at this point, Partner discovered that Buttars was again soliciting investments from individual investors "at the micro level," against the advice of counsel. In early 2009, Ellipse had "no money" and Partner and three other individuals on the board filed a lawsuit against Buttars in an attempt to "get control of the company so that [they] could try

---

2. The beta version of a product "is a nearly complete prototype of a product." *Beta*, Merriam-Webster, https://www.merriam-webster.com/dictionary/beta [https://perma.cc/CPP7-DTQX].

and find another way to get [the technology] to completion so that [they] could pay back . . . all of the investors."

¶8 In response, Buttars resigned as Ellipse's CEO, but "he would not relinquish his shares or his voting rights" and would not allow Ellipse to "go forward because it was his technology." Due to Partner's and Buttars's dispute, the patents for the technology, registered in both their names, became encumbered and were of "no value to the company." Ellipse's bank account was closed on May 1, 2009, and the company "ultimately just dissolved."

¶9 At some point in 2009, before Ellipse's demise, board members discovered that Ellipse funds were being used to make mortgage payments on Friend's home, and they generally "suspected that funds were being misused." Another individual tasked with fundraising for the company said that during this time, Buttars called him and was angry he had not raised more funds, asking, "[H]ow do you expect me to support two families on what you've brought in?"

¶10 During the collapse of Ellipse, Buttars and Friend formed a new company, MovieBlitz, to develop the same technology, and they began raising money anew from individual investors. From approximately 2007 to 2010, Buttars raised over $815,000 on behalf of the two companies.

*Investors*

¶11 The mother of an Ellipse employee (Mother) initially invested $10,000 in Ellipse in 2007. Buttars informed Mother that her money "would be used in producing the [kiosk] product and getting it to market." In March 2009, Mother invested another $5,000 after being told that Ellipse "needed just a little bit more money so they could get [the kiosk] to market." Mother stated that the "general tone of the conversation with" Buttars "was positive in that . . . this was going to be a great thing that they

had going." Mother was never informed that her "investment funds might be used for any other purpose."

¶12    In late May and early June of 2009, Buttars's neighbor (Neighbor) and her boyfriend (Boyfriend) each invested $2,000 in MovieBlitz. Before investing, they met with Buttars and Friend, who showed them "that [they] had patents and . . . they were ready to roll." Buttars and Friend explained the investment opportunity in "fabulous terms" that "seemed to be so close . . . to com[ing] to fruition." The "overall tone of the meeting" was "[p]ositive" with "[n]o risks involved."

¶13    But there were risks involved, of which Buttars failed to inform the two investors. Buttars also informed them that their money would be used to incorporate the company in Nevada and "to produce this [memory] key [and] the kiosk." Buttars did not inform Neighbor and Boyfriend about the predecessor company, Ellipse, and its ultimate failure to bring the same technology to market. In January 2010, Boyfriend invested another $7,000 in MovieBlitz because Buttars and Friend "painted such a pretty picture that this [was] . . . really going to be something" that "sounded too good to be true."[3]

¶14    In February 2010, Neighbor introduced her ex-husband (Ex-husband) to Buttars, and Ex-husband invested $10,000 in MovieBlitz that same month. Before making the investment, Ex-husband met with Buttars, Friend, and other investors. This was "a positive meeting," in which Buttars told Ex-husband that his investment "would be used to develop the [memory] key and the kiosks." There was no discussion that his investment "would be used for any other purpose." Buttars did not inform Ex-husband about Ellipse and its collapse or about previously invested money being used for nonbusiness purposes.

---

3. Boyfriend apparently forgot the other half of this cautionary adage: "If it sounds too good to be true, it probably is."

*Investigation*

¶15 In early 2011, an agent with the State Bureau of Investigation (Agent) began investigating Buttars for his actions regarding Ellipse and MovieBlitz. Agent obtained multiple investigative subpoenas—which a magistrate approved following a review of Agent's good cause statement—for the bank records of Buttars, Friend, Ellipse, and MovieBlitz. The banks involved were Frontier Community Bank (Frontier) and JP Morgan Chase Bank (Chase). The first subpoena was issued on April 21, 2011, for Buttars's and Ellipse's Frontier records from January 1, 2007, through April 1, 2011. A second subpoena was issued on March 5, 2012, for Buttars's and Ellipse's Chase records from January 1, 2007, through April 1, 2011. A third and final subpoena was issued, again to Frontier, on August 20, 2012, for the account records of MovieBlitz and Friend ranging from June 1, 2008, through December 31, 2010. Frontier produced the requested records in "three or four" batches but failed to attach custodial certificates to any of the batches.[4] Instead, Frontier

---

4. The rule of evidence that allows records such as these to be admitted into evidence is known as the business records exception to the hearsay rule. *See* Utah R. Evid. 803(6). This rule requires that (1) "the record was made at or near the time by . . . someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business [or] organization"; and (3) "making the record was a regular practice of that activity." *Id.* R. 803(6)(A)–(C). The party seeking admission of these records through this rule must show that these conditions are met through either "the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)." *Id.* R. 803(6)(D). In short, the party must provide foundation for the records through a witness or a certificate from the custodian "that must be signed in a manner that, if falsely made, would subject the signer to criminal

(continued…)

provided only two free-standing custodial certificates to Agent. Chase, however, produced the records requested of it with an adequate custodial certificate.

¶16   Each subpoena directed the banks "that pursuant to § 77-22a-1(4), Utah Code, . . . you are not to disclose to any person the existence or service of the subpoena, the information being sought, or the existence of an investigation, as it could impede this ongoing criminal investigation." The district court later found that because "[t]he State did not seek or obtain a secrecy order from the Court [as required by section 77-22-2(6)(a)(i) of the Utah Code][5] to keep the investigation or material obtained through the subpoenas secret," "[t]he inclusion of [the secrecy] language was in error." The banks adhered to these instructions, however, and Buttars did not receive notice from the banks of the subpoenas or of the subsequent disclosure of his bank records to Agent.

¶17   After interviewing the investors and reviewing the bank records, Agent discovered that Buttars had not informed the investors of Ellipse's and MovieBlitz's low account balances at the time they invested and that Buttars had been using investor funds from the companies' business accounts for illegitimate purposes. He further discovered that investor money had been

---

(…continued)
penalty." *See id.* R. 902(11). Otherwise, the records do not qualify for admission under the exception.

5. The statute requires that before a subpoena with the complained-of secrecy language can be issued, the State must show that there is "a reasonable likelihood that publicly releasing information about . . . the substance of the evidence resulting from a subpoena or interrogation would pose a threat of harm to a person or otherwise impede the investigation." Utah Code Ann. § 77-22-2(6)(a)(i) (LexisNexis 2017).

directly deposited into Buttars's personal checking account on multiple occasions and that Buttars had initiated a number of transfers from Ellipse's and MovieBlitz's accounts to his own personal account, from which questionable payments had been made.

¶18　Agent found that at the time Mother invested her $5,000, Ellipse had only $1,299 in its account, and within six weeks, all of Mother's investment had been spent. The records showed that Buttars used that money, along with $10,000 from another investor, to pay his ex-wife for legal fees, purportedly for patent work she performed months earlier; to pay a private investigator; and for personal expenses such as groceries, restaurant tabs, and gas. Buttars also transferred some of that money to his own personal checking account to pay for personal items such as a phone bill, insurance, and a satellite television bill.

¶19　The records also revealed that at the times Buttars convinced Neighbor and Boyfriend to invest in MovieBlitz, its account balance ranged between $0 and $597. Overall, Neighbor and Boyfriend invested $11,000, of which $8,500 was directly deposited into MovieBlitz's account and $2,500 was directly deposited into Buttars's personal checking account. Soon after these deposits were made, $5,715 of the amount deposited into MovieBlitz's account was transferred to Buttars's personal account and $500 was transferred to Friend's personal account. In general terms, the records showed that Neighbor's and Boyfriend's investment money—found in both MovieBlitz's business account and Buttars's personal checking account—was used to pay another investor; make a debt settlement payment; and pay for restaurant tabs, a talent agency, gas, groceries, natural gas bills, child support, electric bills, clothing, and other personal expenses. Only $859 was used toward MovieBlitz's incorporation in Nevada—one of the uses to which Buttars told Neighbor and Boyfriend he would be putting their money. Not long after Neighbor and Boyfriend invested with Buttars, the

account balances in the MovieBlitz account and Buttars's personal checking account were either zero, close to zero, or in the negative.

¶20 Finally, at the time of Ex-husband's $10,000 investment, MovieBlitz's account had a balance of only $294 and, within a month, all but $5 of his investment had been spent. The records showed that Ex-husband's $10,000 was initially deposited into MovieBlitz's account, but nearly $6,000 was soon transferred to Buttars's personal account while another $3,000 was transferred to Friend's personal account. The money transferred to Buttars's personal account was first used to make up a negative balance in the account and then to pay for gas, groceries, restaurant tabs, music, debt settlement, bail bonds, child support, and other personal expenses. Agent also discovered that at the time the investors invested in either Ellipse or MovieBlitz, those company accounts were significantly underfunded, ranging from $0 at the lowest to about $1,300 at the highest.

¶21 As a result of Agent's investigation, the State charged Buttars with four counts of securities fraud and four counts of theft—one count each for his dealings with the four investors previously discussed—and one count of engaging in a pattern of unlawful activity.

*Bank Records, Summaries, and Cover Sheets*

¶22 Before proceeding to trial, Buttars moved to suppress the Frontier and Chase bank records. Buttars argued that Agent obtained the records in violation of "the Fourth Amendment to the United States Constitution and Article I, § 12 of the Utah State Constitution." Specifically, he claimed that the subpoenas issued to the banks "were unlawful" because "the State inexplicably demanded that the subpoenaed parties not disclose the existence of the subpoenas, [improperly] relying up[on] Utah Code Ann. § 77-22a-1" and that "[t]his erroneous demand for secrecy violated [Buttars's] constitutionally protected rights to privacy in [his] bank records." Later, Buttars opposed the

admission of the records on the additional ground that "the affidavits of the record custodians are either entirely missing or otherwise fatally flawed," rendering the records "inadmissible hearsay [that] do not fall within the business records exception" of rule 803(6) of the Utah Rules of Evidence.

¶23 The district court denied Buttars's motion to suppress the records, ruling that (1) under the Subpoena Powers Act, the State is not required "to provide notice to the subject of a criminal investigation when the State initiates an investigation or issues subpoenas"; (2) the improper the "inclusion of the secrecy language . . . did not make the subpoenas unlawful or unreasonable under" the United States or Utah constitutions because "[t]he state met all the requirements of obtaining a lawful subpoena"; and (3) even if the subpoenas were unlawful, the good faith exception would apply because "the State obtained judicial review of the investigative subpoenas and reasonably relied on the Court's approval of the subpoenas." The court did not address Buttars's rule 803(6) argument in its order.

¶24 Following the court's ruling, the State had an expert (Expert) prepare summaries of the bank records, with detailed cover sheets containing Expert's notations and opinions on certain transactions, which gave an overview of the financial information previously discussed. *See supra* ¶¶ 17–20. The cover sheets also tracked Buttars's use of the investment money from the four investors. The State then sought a pretrial ruling on the admissibility of the summaries and the underlying bank records under rules 703, 803(6), 807, and 1006 of the Utah Rules of Evidence.

¶25 The district court ruled that the underlying bank records were not admissible as business records under rule 803(6) because the State was not "able to establish the necessary foundation" under rule 902(11) due to the missing and untethered custodial certificates. But it ruled that both "the bank

records and bank summaries [were] admissible under the residual hearsay exception" of rule 807 because the bank records and summaries met the rule's admissibility criteria.[6] Finally, the court ruled that because the bank records were admissible, the summaries of the bank records were also admissible under rule 1006. And "[b]ecause the bank records and summaries [were] admissible for their substance under Rule 807, the Court [did] not address whether the records or summaries [were] also admissible under Rule 703." The court did not distinguish between the summaries and cover sheets, apparently considering the cover sheets to be part of the summaries.

*Trial*

¶26 The State called Expert to testify and had the summaries and the attached cover sheets admitted through him, but the actual bank records were not admitted. Expert testified that the summaries he compiled were based on the bank records he examined and that they "fairly and accurately reflect[ed]" those records. The cover sheets contained Expert's commentary and opinions labeling certain transactions, such as the payments for a private investigator, groceries, a talent agency, and phone bills as "questionable" or "potentially legitimate," and money in Buttars's personal checking as being "commingled" with "investor money." Over the course of his direct examination, Expert went through a detailed explanation of the cover sheets

---

6. Rule 807 requires that for hearsay to be admissible under the residual exception it must (1) have "equivalent circumstantial guarantees of trustworthiness," (2) be "offered as evidence of a material fact," (3) be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," and (4) be such that "admitting it will best serve the purposes of these rules and the interests of justice." Utah R. Evid. 807(a)(1)–(4). The district court found that the bank records satisfied these four requirements.

and, to a lesser extent, the summaries themselves, explaining why he labeled certain transactions as questionable and money in the bank accounts as commingled. Overall, Expert's testimony was tied to the cover sheets he created, and the State used these cover sheets and the summaries as the primary evidence to show how Buttars misused investor funds.

¶27 After hearing testimony from Expert, the four investors, Partner, and other board members and corporate officers of Ellipse, the jury found Buttars, who did not testify, guilty on all counts of securities fraud and one count of pattern of unlawful activity, but it acquitted him of the four theft charges. Buttars appeals.

ISSUES AND STANDARDS OF REVIEW

¶28 Buttars primarily argues that "[t]he Frontier bank records were inadmissible hearsay" and thus the summaries that "relied either solely or mostly on the Frontier records" were likewise inadmissible. Conversely, the State asserts that the bank records and the summaries were properly admitted by the district court under the residual exception to the hearsay rule found in rule 807 of the Utah Rules of Evidence.[7] "In reviewing hearsay

---

7. The State also asserts that even though the court ruled that the Frontier records were not admissible under the business records exception to the hearsay rule, "the majority of the records were properly certified and should have been ruled admissible under that exception." The State claims that the bank records received from Frontier in response to the first subpoena "were produced in two distributions, each with its own custodial certification," and that the records received as a result of the second subpoena "were produced via a secure email . . . with[out] a custodial certificate," resulting in Agent receiving only three batches of records from Frontier.

(continued…)

rulings, we review legal questions for correctness, factual questions for clear error, and the final ruling on admissibility for abuse of discretion." *State v. McNeil*, 2013 UT App 134, ¶ 14, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699.

---

(…continued)

The record on appeal is fairly confusing on this point. There are two custodial certificates in the record from Frontier dated after the first subpoena and before the second subpoena, seeming to indicate that the certificates were for the two batches that were produced as a result of the first subpoena issued to Frontier. But we cannot conclusively state that this is the case because the batches are not part of the record on appeal and there was confusion below as to whether there were only two batches delivered before the second subpoena was issued and only three batches in total. Agent testified that he obtained records from Frontier "three or four times." Agent also said that he "probably picked up physical[] records twice" and then Frontier "mail[ed] [him] a duplicate copy of one of the sets of records" and then he received the last batch through "a secure email with those records attached."

The district court subsequently found that "[t]he testimony is that there were three or four batches of records from Frontier Bank [and] [t]here are two certificates of authentication or declaration." It continued, however, that "[i]t is unclear from the testimony and evidence what certificates go with which batch" because "there was no testimony to support where these certificates of authentication went, and with what records."

In considering an alternative ground for affirmance, we are "limited to the findings of fact made by the trial court and may not find new facts or reweigh the evidence in light of the new legal theory or alternate ground." *Bailey v. Bayles*, 2002 UT 58, ¶ 20, 52 P.3d 1158. Because the State's alternative theory of admissibility is contrary to the district court's findings, it does not provide an alternative ground for affirmance.

¶29 Second, Buttars asserts that the district court erred in denying his motion to suppress the bank records because they were "unconstitutionally seized" due to the subpoenas' inclusion of the secrecy language contained in Utah Code section 77-22a-1(4). "We review a trial court's decision to grant or deny a motion to suppress for an alleged [constitutional] violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "[T]he court's factual findings are reviewed for clear error [while] its legal conclusions, . . . including its application of law to the facts of the case," are reviewed for correctness. *Id.* Even though we reverse Buttars's convictions on another ground, we address this issue because it will likely arise again on remand. *See generally State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (recognizing an appellate court's ability to address "other issues presented on appeal that will likely arise during retrial").[8]

ANALYSIS

I. Admissibility of Bank Records

¶30 Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement," Utah R. Evid. 801(c), and is ordinarily inadmissible at trial,[9] *id*. R. 802. But the Utah Rules of Evidence provide certain exceptions to the general

---

8. Buttars also contends that the district court erred in allowing Expert to give "testimony that violated rules 702, 704, and 403" of the Utah Rules of Evidence and that his trial counsel provided ineffective assistance in three respects. Because we reverse Buttars's conviction on the ground that the court erred in admitting his bank records and the summaries, we do not consider these further assertions of error.

9. It is undisputed in this case that the bank records are hearsay.

prohibition on the admission of hearsay evidence. Pertinent to the issue at hand are two exceptions. The first is what is known as the business records exception, found in rule 803(6). This rule allows records of a regularly conducted activity to be admitted if

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

*Id*. R. 803(6).

¶31   The party seeking the admission of business records under rule 803(6) must show that these conditions are met through either "the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)." *Id.* R. 803(6)(D). Under rule 902(11), a party must provide foundation for the relevant records through a certificate from the custodian "that must be signed in a manner that, if falsely made, would subject the signer to criminal penalty." *Id.* R. 902(11). And regarding summaries of these types of records and their admissibility, we have previously

held that "a summary cannot be used as a cover for bringing inadmissible hearsay evidence into the courtroom."[10] *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2013 UT App 146, ¶ 20, 305 P.3d 171 (quotation simplified). "Thus, the proponent of a summary must also show that the underlying records are admissible, which typically requires a showing that the records qualify under the business records exception to the hearsay rule." *Id. See also International Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418, 422 (Utah 1981)

---

10. Buttars argues that the summaries were inadmissible in their own right because they "did not prove the content of the underlying bank records." But because we ultimately hold that the underlying Frontier records were inadmissible and reverse on this basis, we do not need to address the presentation of the summaries to the jury. This issue may arise again on remand, however, so we note that the cover sheets themselves—not necessarily the summaries—are concerning. *See generally State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867. Under rule 1006 of the Utah Rules of Evidence, a party may present "a summary, chart, or calculation to *prove the content* of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Utah R. Evid. 1006 (emphasis added). These summaries can only "prove the content" of what they are summarizing, and Expert's notations on the cover sheets, characterizing certain transactions as "questionable" and that money was "commingled" was an inappropriate use of this rule, because these notations are Expert's opinion and not part of the content of the actual underlying records. Although the cover sheets may well be admissible as demonstrative evidence illustrating Expert's testimony, they do not constitute substantive evidence under rule 1006. *See generally State v. Perea*, 2013 UT 68, ¶¶ 45–46, 322 P.3d 624 (explaining the distinction between substantive and demonstrative evidence).

("Rules governing the admissibility of documentary summaries and of hearsay evidence must both be complied with.").[11]

¶32 The second pertinent rule is the residual hearsay exception found in rule 807 of the Utah Rules of Evidence. That rule provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> > (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> >
> > (2) it is offered as evidence of a material fact;
> >
> > (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> >
> > (4) admitting it will best serve the purposes of these rules and the interests of justice.

Utah R. Evid. R. 807(a).

---

11. In the present case, the court deemed all the underlying bank records admissible under the residual exception, but the State did not seek to admit those records directly. Instead, it had Expert prepare summaries of the records pursuant to rule 1006 and succeeded in having the summaries admitted. Therefore, because the summaries were created from the underlying bank records, if the bank records were inadmissible hearsay, then the summaries are on no stronger footing and would likewise constitute inadmissible hearsay.

¶33    "The residual exception is a catchall provision that may be applied when a hearsay statement 'is not specifically covered by a hearsay exception in Rule 803 or 804.'" *State v. Clopten*, 2015 UT 82, ¶ 23, 362 P.3d 1216 (quoting Utah R. Evid. 807(a)). This exception "was intended for use in those rare cases where, although the out-of-court statement does not fit into a recognized exception, its admission is justified by the inherent reliability of the statement and the need for its admission," *State v. Nelson*, 777 P.2d 479, 482 (Utah 1989), and is therefore "to be used rarely and construed strictly," *State v. Workman*, 2005 UT 66, ¶ 12, 122 P.3d 639. "Furthermore, several federal circuit courts have said that [the residual exception] is to be 'used *very rarely*, and only in *exceptional circumstances*.'" *State v. Webster*, 2001 UT App 238, ¶ 26, 32 P.3d 976 (emphasis in original) (quoting *United States v. Trujillo*, 136 F.3d 1388, 1395 (10th Cir. 1998)).

¶34    We interpret our rules of evidence "like statutes, . . . according to their plain language." *Burns v. Boyden*, 2006 UT 14, ¶ 19, 133 P.3d 370. And when confronted with two potentially applicable provisions, the "more specific in application governs over the more general provision." *Carter v. University of Utah Med. Center*, 2006 UT 78, ¶ 12, 150 P.3d 467 (quotation simplified). In the present case, this means that the bank records should not have been admitted on the strength of the residual rule given the *precise* applicability and primacy of the business records exception.

¶35    Here, the business records exception is the specific rule dealing with the bank records, and it therefore governs over the more general, less favored residual exception. The business records exception is in place so that parties can, in a regularized and predictable way, seek to have these exact types of records admitted into evidence. Parties are therefore required to comply with this rule if they wish to seek admission of such records because the residual exception was only intended to be used when the records "do[] not fit into a recognized exception."

*Nelson*, 777 P.2d at 482. The bank records in question absolutely "fit" within the scope of the business records exception.

¶36    We are not necessarily prepared to say that parties could never seek to have business records admitted under the residual rule, as we can envision scenarios in which a custodian of business records has long since passed away or a company has gone out of business and cannot produce the necessary documentation to authenticate them under rule 902(11). In such scenarios, parties might be able to have the business records admitted under the residual exception, provided that they make a compelling showing explaining why, even though the business records do not satisfy the business records exception, the records should nevertheless come in under the residual rule.

¶37    But in the present case, it was error to admit the bank records under the residual rule without a more compelling explanation for why the business records exception would not suffice. On appeal, the State concedes that "nothing in the record . . . suggest[s]" that it could not have called a witness to testify or obtained certification as required by rules 803(6) and 902(11). Therefore, there is nothing to indicate that this case would be one of those "rare cases," *Nelson*, 777 P.2d at 482, featuring "exceptional circumstances" that would warrant the use of the residual exception, *Trujillo*, 136 F.3d at 1395 (quotation simplified). *See Clopten*, 2015 UT 82, ¶ 23; *Webster*, 2001 UT App 238, ¶ 26. Thus, the bank records were not admissible under the residual rule and, by extension, the summaries of those records, which is one step removed from the business records themselves, was also inadmissible.

## II. Prejudice from Admission of the Frontier Records

¶38    Having determined that the district court erroneously admitted the bank records under the residual rule, we must now consider whether the error prejudiced Buttars. *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded.").

To do this, "we must determine whether there is a reasonable likelihood that the outcome of [Buttars's] trial would have been more favorable to him" had the court not erred in admitting the bank records. *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987). "This determination . . . is based upon a review of the record . . . [and] require[s] us to determine from the record what evidence would have been before the jury absent the error." *Id.*

¶39 While the district court ruled that all the bank records were inadmissible under the business records exception and admitted them under the residual rule, it is clear that the Chase records had the proper custodial certificates and were readily admissible under the business records exception. Thus, we analyze whether Buttars was prejudiced by the court's error in admitting the Frontier records, which lacked such certificates. *See supra* note 7.

¶40 The State asserts that Buttars has not suffered prejudice from this error, arguing that the State could have simply called a witness to testify or obtained certification as required by rules 803(6) and 902(11) of the Utah Rules of Evidence to authenticate the Frontier records, thereby allowing their admission. But nothing in the record suggests that this was actually the case. In fact, the opposite is more likely. One assumes that if the State could have so easily called a witness to vouch for the records or obtained the necessary certification, it would have done so. Instead, the State and Buttars litigated the admissibility of these records at some length, and the State put all its eggs in the residual rule basket. In April 2016, after the State moved for the records to be admitted under rule 703[12] or 803(6), the district

---

12. Rule 703 states that

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts

(continued…)

court ruled that the records were not admissible under rule 803(6) because the State "need[ed] to provide foundation in support of the bank records to establish an indicia of reliability." It did not rule on the rule 703 portion of the State's motion because neither party fully briefed the issue, and it asked for further briefing so that it could more fully consider that rationale. In the requested briefing, the State strengthened its rule 703 analysis but alternatively asked the court to admit the records under the residual exception. Nearly two months after its initial ruling, the court granted the State's motion, disregarding the rule 703 portion of the State's analysis and concluding that the bank records were admissible under the residual rule.

¶41 This procedural history appears to contradict the State's position on appeal that it could have easily called a witness to testify and provide authentication or obtained certification for the Frontier records under rules 803(6) and 902(11).[13] As

_____

(…continued)

> or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Utah R. Evid. 703.

13. Rule 803(6) requires that the party seeking the admission of records through the business records exception provide foundation for the records through "the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)." Utah R. Evid. 803(6)(D). Rule 902(11) provides that for business records to be admitted, the foundation of the records must be "shown by a certification of

(continued…)

indicated, if it was such a simple task, we fail to see why the State did not undertake it in the two-month period after the court's first ruling in April when it informed the State of the problem with the records' authentication. Rather than continuing to try and get the records admitted under a different rule—which result was less assured than if the State had simply attempted to get them admitted under rule 803(6)—calling upon the custodian to testify or furnish the required certification in compliance with rule 803(6) would have been a much more sensible way to proceed. And if, contrary to its position on appeal, the State could not have done this, then it should have made a more compelling showing of the problems with authenticating the records in the usual way and then moved to admit them under the residual exception. But the State did not do so. Therefore, in analyzing prejudice, we are unwilling to conclude that the State could have simply called the custodian as a witness or obtained certification for the records to be admitted under the business records exception.

¶42 This is not the end of the prejudice inquiry, however, because we must also determine whether, without these inadmissible records, Buttars would have been likely to receive a more favorable result at trial. To convict Buttars of securities fraud, the State had to prove that he, "in connection with the offer, sale, or purchase of any security, . . . [made] any untrue statement of a material fact or . . . omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Utah Code Ann. § 61-1-1(2) (LexisNexis 2018). And to convict him of a pattern of unlawful activity, the State was required to prove that Buttars "engag[ed] in conduct which

---

(…continued)
the custodian or another qualified person that must be signed in a manner that, if falsely made, would subject the signer to criminal penalty."

constitute[d] the commission of at least three episodes of unlawful activity, which episodes [were] not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Id.* § 76-10-1602(2).

¶43    The cover sheets and the underlying summaries provided the jury with a detailed explanation of how much money was in the business accounts when Buttars solicited the investor money, where the investor money was deposited, and how Buttars used that money. The majority of the evidentiary backing for these summaries and the cover sheets came directly from the inadmissible Frontier records, and our review of the record on appeal shows that it is not reasonably likely that Buttars would have been convicted based on the Chase records alone. Indeed, the summaries and cover sheets contained only fleeting references to the Chase account, indicating that the State understood that if it were to get a conviction, the Frontier records were vital to its case.

¶44    The State's case hinged on the Frontier records, and without those records, the State would have had an extremely difficult task of proving that Buttars made misleading statements that amounted to a pattern of unlawful activity. The Frontier records were tied directly to testimony from the investors, who explained what Buttars had told them regarding how he was going to use their money and the great shape the companies were in. The Frontier records showed that he did not use the money in the manner which he told the investors he would and that the companies were actually severely underfunded at the time he solicited the investors' money, thus making his statements to the investors misleading or untrue. In conjunction with the investors' testimony, then, the Frontier records gave the jury an adequate basis on which to find Buttars guilty on four counts of securities fraud and one count of a pattern of unlawful activity. But without these records, it is reasonably likely that the jury would not have found that Buttars committed securities

fraud, much less that he perpetrated a pattern of unlawful activity.

¶45 The district court's error in admitting the Frontier records under the residual exception prejudiced Buttars because nothing in the record on appeal establishes that the State could have actually called a witness to authenticate the Frontier records or obtained certification, and without the Frontier records there is a "reasonable likelihood that the outcome of [Buttars's] trial would have been more favorable to him." *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987).

### III. Suppression of the Bank Records

¶46 Buttars asserts that the district court erred in denying his motion to suppress the Frontier and Chase records, arguing that the erroneous inclusion of the secrecy language from Utah Code section 77-22a-1(4) rendered the subpoenas illegal, resulting in the bank records being "unconstitutionally seized." While the statute was violated in a technical manner, mere violations of statutes do not automatically rise to the level of a constitutional violation. *See Screws v. United States*, 325 U.S. 91, 108 (1945) ("Violation of local law does not necessarily mean that federal rights have been invaded."); *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982) ("The violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution.") (quotation simplified). Buttars has not met his burden of showing that the mere inclusion of the erroneous secrecy language, which resulted in Buttars not receiving notice of subpoenas he could not have quashed in any event, renders the seizure of the bank records unreasonable and violative of his Utah and United States constitutional rights.

¶47 Insofar as Buttars asserts that he was entitled under the statute to suppression of the bank records, his argument is unavailing because he fails to demonstrate prejudice in that regard. Rule 30(a) of the Utah Rules of Criminal Procedure "foreclose[s] reversal of a conviction unless the error is

substantial and prejudicial in the sense that there is a reasonable likelihood that in its absence there would have been a more favorable result for the defendant." *State v. Dominguez*, 2011 UT 11, ¶ 22, 248 P.3d 473 (quotation simplified). Buttars has not shown that had the complained-of language not been included in the subpoena and had he received notice of the subpoenas that he would have been able to quash them. He argues that he "was entitled to a pre-compliance opportunity to object [to the subpoenas] regardless of whether he would ultimately succeed in quashing them." This is incorrect. Buttars must show that "there is a reasonable likelihood that [absent the error] the outcome . . . would have been more favorable to him." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). Buttars has not attempted to show that he would have succeeded in quashing the subpoena and therefore has not shown prejudice on this claim.

¶48 Thus, we agree with the district court that "even if the secrecy provision was not included in the subpoena[s], there is no evidence that [Buttars] would have . . . successfully moved to quash them" and thus that absent the error there is a reasonable likelihood that he would have received a more favorable result. "We therefore conclude that the [secrecy language] constituted nothing more than [a technical error] which did not affect the validity of the [subpoenas] and the search conducted thereunder." *State v. Anderton*, 668 P.2d 1258, 1262 (Utah 1983).

CONCLUSION

¶49 Absent a showing by the State that the circumstances required it to seek admission under rule 807 rather than under the usual business records exception found in rule 803(6), the district court erred in admitting the Frontier bank records under the residual exception found in rule 807 of the Utah Rules of Evidence. This error prejudiced Buttars because those records

constituted the bulk of the critical evidence presented, on which the jury found Buttars guilty on four counts of securities fraud and one count of pattern of unlawful activity. Without those records, there is a reasonable likelihood that Buttars would have received a more favorable result at trial. Accordingly, Buttars is entitled to the new trial he requests, and we reverse and remand for that trial or for such other proceedings as may now be appropriate.

————————