2020 UT App 131

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SCOTT LOGAN GOLLAHER,
Appellant.

Opinion
No. 20160317-CA
Filed September 24, 2020

Second District Court, Morgan Department
The Honorable Noel S. Hyde
No. 121500023

Peter Daines, Attorney for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

ORME, Judge:

¶1     Scott Logan Gollaher challenges his convictions on four counts of aggravated sexual abuse of a child. First, he contends that after the jury informed the trial court that two jurors had difficulty hearing the victims' testimonies, the court erred in denying his motion for a mistrial, instead opting to replace the incapacitated jurors with two alternates. He also asserts that the court erred in declining his request to specifically ask whether the members of the reconstituted jury could hear material testimony, instead inquiring only generally regarding their capacity to fully consider all evidence presented at trial. Second, he argues that the jury instructions did not adequately inform the jury of the constitutional unanimity requirement. Finally, he asserts that the court erred in permitting the State to present

evidence of a prior conviction for sexual abuse of a child by calling the prior victim to testify instead of reading the stipulation that he had offered to the jury. We affirm.

BACKGROUND

¶2 In 2012, the State charged Gollaher with four counts of first-degree aggravated sexual abuse of a child for touching the clothed genitalia of two eleven-year-old girls, AM and OP.[1] *See* Utah Code Ann. § 76-5-404.1(2), (4) (LexisNexis 2012). In the information, the State did not identify the specific incidents of touching for which he was charged. In 2016, the trial court held a nine-day jury trial at which Gollaher represented himself, with the limited assistance of standby counsel.

¶3 Testimony began on the third day of trial—a trial that was fraught with auditory issues. AM and OP, both soft-spoken minors, were the only witnesses to testify that day. Although the witness stand held a microphone, its purpose was to record the proceedings rather than to amplify the witnesses' voices. OP testified first. On cross-examination, Gollaher asked her to speak "a little louder." Not long thereafter, the court also asked her, on account of her "somewhat light voice," to "speak up just a little bit to make sure that the jurors can hear you."

¶4 Following a break between OP's and AM's testimonies, the court noted that it had received "a report that the jurors are . . . having a difficult time hearing." It noted that although "some [jurors] can hear fine," others had "some more difficulty" hearing "[c]ounsel or the witness." The court stated that the issues were "attributable largely to simply the layout of the

_____

1. Because the underlying facts giving rise to Gollaher's charges and subsequent convictions are immaterial to our resolution of the issues Gollaher raises on appeal, we forgo providing a detailed recitation of those facts.

[court]room," where counsel's podium was positioned in such a way that Gollaher and the prosecutor had to question witnesses with their backs turned to the jury. As a result, in hopes that their "voice may carry a little bit better," the court asked them to "direct [their] physical orientation to the bench" and turn their heads "both directions" between the witness and the jury as they spoke. The court also instructed the bailiff to "maintain contact with the jury" and to alert the court if certain jurors continued to have difficulty hearing the testimony. Additionally, the court at times turned off a fan that also interfered with the acoustics of the room.

¶5 Following these adjustments, the State called AM as a witness. As soon as AM was sworn in, the court reminded her to "speak up as much as you can so that everybody [who] needs to hear the information in your testimony will be able to hear clearly." However, just a few moments into AM's testimony, Gollaher's standby counsel interrupted, stating, "I'm even having a hard time hearing the witness from where I'm sitting." The court then noted that AM had "a soft voice" and asked her to "project your voice a little bit more . . . to the point that it feels like you are talking loudly." Shortly after AM resumed her testimony, the court interrupted her, urging, "Again, speak up, ma'am. Keep that authoritative voice going." And a little later, the court again requested, "try and project your voice as best you can," to "increase the volume." AM completed her testimony that day.

¶6 At the beginning of the next day of trial, the court noted that "[t]he jury has had some issue with hearing some of the witnesses" and stated for the record that it had obtained "some devices to hopefully help with the hearing."[2] However, a juror

---

2. The record is unclear as to what specific type of hearing devices the court employed. The court generally stated that it had obtained "some hearing assisting devices for some members of the jury."

informed the court that only one of the devices worked; hers did not. The court accommodated her by reorganizing the jurors' seating arrangement so that she could hear better from her new position. The court also added a sound-amplifying microphone to the witness stand. These and other measures appear to have largely improved the jury's ability to hear subsequent testimony, although the court occasionally had to ask witnesses to hold the microphone closer to their mouths and on at least one occasion, the court briefly halted proceedings while technological issues with that microphone were resolved. The court at times "apologize[d] for the technology limitations," stating that it was "doing the best [it] can." But in the end, when during closing argument Gollaher raised a concern that the jury could not hear certain testimony, the court declared that it was "satisfied" that the jury "did hear a complete record" because "there were numerous statements" throughout the trial "to ensure that they did."

¶7     SCH was the first witness to testify after AM and OP. In 1996, Gollaher had been convicted of second-degree sexual abuse of a child for improperly touching then-twelve-year-old SCH. At a prior evidentiary hearing, the trial court granted the State's motion to admit evidence of that conviction through SCH's testimony. The court's ruling "permit[ted] the introduction of the conviction and the summary of the facts supporting the conviction, but no more." At trial, Gollaher offered to stipulate to his prior conviction in lieu of SCH's testimony. The State declined this offer, and the court permitted SCH to testify.

¶8     SCH recounted Gollaher's abuse of her in detail. SCH also testified, "I . . . instantly knew [Gollaher] was a bad guy . . . and I thought he would kill me or kill my family." Gollaher objected to these remarks, and the court sustained his objection. SCH further testified, among other things, that she disclosed the abuse to authorities six months after it happened, that she testified at trial after Gollaher was charged, and that Gollaher was convicted. Several other witnesses testified after SCH.

¶9 Although the State presented evidence of approximately eight prohibited touches of AM and OP by Gollaher, the jury instructions on each of the four charged counts did not identify a specific instance of touching. Instead, four identical elements instructions recited that the jury "must find from the evidence, beyond a reasonable doubt, that in an instance separate from the instances which form the basis of the State's claims on [the other three counts], all of the following elements of that crime are established." Those instructions did not specifically require a unanimous decision. Instead, three other instructions discussed the unanimity requirement. One instruction provided, in relevant part, "It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching a unanimous agreement, if your individual judgment allows such agreement." Another instructed, "This being a criminal case, it requires a unanimous concurrence of all jurors (i.e., all voting the same) to find a verdict." The third—and most important—unanimity instruction was not part of the written jury instructions, as hereafter explained.

¶10 Gollaher objected to the written instructions, requesting that the elements instructions for each count identify a specific victim and touching. The court denied Gollaher's request, ruling that "[i]t is not required that the instructions identify in minute detail the particular person or the particular activity which is claimed to be the specific offending conduct."

¶11 During closing argument, the prosecutor suggested that the jury could "pick or choose" which four of the eight possible instances of prohibited touching it could convict Gollaher of without "necessarily hav[ing] to agree from juror to juror on the top four counts." The prosecutor explained that, for example, "one juror may have two counts . . . where OP was molested, and another juror may have only one count when she was molested and three counts when [AM] was molested." When the prosecutor finished addressing the jury, and before the jury heard Gollaher's closing argument, the court stated—without being prompted—that it "has determined that it

is both appropriate and necessary to give an additional instruction to correct what the Court believes to be an incorrect statement of the law during the State's argument." The court then clarified,

> The jury must find unanimously four separate instances, specifically as provided by the instructions. It is not appropriate for each juror to independently determine whether there are some number of offenses and then aggregate that determination. The jury must make a determination as to each count, and be able to find unanimously a specific instance that meets the criteria for the offense as to that count.
>
> If such a unanimous determination cannot be made as to four separate instances, then whatever number or no instances that are determined unanimously will control the jury's verdict. There must be identified instances on which the jurors unanimously agree for each offense charged.

¶12 At the close of trial, the court excused the two alternate jurors, and the remaining jurors retired to deliberate. Approximately 30 minutes into its deliberations, the jury asked for transcripts of the proceedings, and another 24 minutes later, asked, "Can we have a transcript of the girls testimony where 2 of the jurors could not hear & there was no microphone?" On the heels of this second request, the prosecutor suggested excusing the two jurors who had difficulty hearing and replacing them with the two alternate jurors whom had just been excused. Gollaher responded that recalling the alternates was a "legal fiction," and instead moved for a mistrial. The court stated that "[w]ithout knowing the extent of the claimed incapacity to recall or understand the testimony, . . . it cannot make a finding that the jurors are unable to deliberate fully and effectively." To assist it in making this determination, the court, with the parties'

assistance, formulated three questions that it sent back to the two jurors who could not hear: (1) "Describe why you are requesting the review of a transcript," (2) "Describe the extent to which you had difficulty hearing or understanding the testimony of any witnesses," and (3) "Specifically identify the witnesses involved." (The court also contacted the two alternate jurors and asked them to return to the courthouse.)

¶13 The first juror answered, "I could not hear completely the witnesses AM and OP. They are soft spoken. The transcript would help me know what was said," and also added that "[s]ome of the questions asked by [Gollaher] could not be heard." The second juror responded, "I had trouble hearing [Gollaher] and AM and OP, the girls were quiet." The second juror also stated, "The first day was extremely hard to hear because of my hearing loss. There was no microphone for their quiet testimonies. The next day I had my hearing aids turned up."

¶14 In response to these answers, the court instructed the jury to suspend deliberations. It then questioned the two alternate jurors about whether they had discussed the trial with others after the court excused them. One alternate stated that she had contacted her husband to let him know she was home but did not discuss the case with him and did not express any opinion on the case. The other alternate responded that he had let his mother know that he was finished and had arranged to do something with her later. He also stated that he had not discussed any specifics of the case with her and had not expressed an opinion on the matter. The court then engaged in additional questioning, including asking whether "in the broadest possible way" there was anything that would have caused either of them "to have a different perspective now than [they] did at the time that [they] left their seats originally." Both alternate jurors answered in the negative.

¶15 The court excused the two jurors who had had difficulty hearing OP's and AM's testimonies and replaced them with the

two alternate jurors. Gollaher did not object to the alternates being reseated. Instead, he expressed concern as to whether they and the remaining jurors could hear the witnesses' testimonies. "Other than that," he said, he had "no objection." The court expressed concern about "suggesting potential disabilities" to the jury, and therefore decided not to ask the jurors specifically about their ability to hear, electing instead to make general inquiries into their capacity to deliberate.

¶16 When the reconstituted jury—now including the two alternate jurors—returned to the courtroom, the court re-administered the juror oath. After questioning the jurors about their ability to remain unaffected by the replacement of the two jurors with the alternates and their ability to begin deliberations anew, the court asked, "Do any of you believe, based upon your entire experience in the trial, that you will have any disability from fully and fairly considering all of the evidence that was presented at the trial if you are asked again to deliberate in this matter?" It also inquired, "Are any of you currently acting or operating under any incapacity to fully and fairly consider all of the evidence that was presented?" After receiving negative responses to both questions, and following additional instructions, the court excused the reconstituted jury to deliberate.

¶17 Gollaher again expressed concern as to whether the reconstituted jury adequately heard the testimony. The court ruled that, because it had received negative responses to its inquiries into "whether there was any concern or incapacity or inability to fully and fairly consider all of the evidence, emphasis being placed on 'fully' and 'all' in several questions as to any incapacity or inability or deficiency with respect to the jurors, . . . the jury as presently constituted is qualified to hear the case."

¶18 The reconstituted jury returned guilty verdicts on all four counts. Gollaher appeals.

ISSUES AND STANDARDS OF REVIEW

¶19    Gollaher raises three issues on appeal. First, he contends that the trial court erred in declining to order a mistrial or conducting a more thorough investigation into the extent to which all members of the reconstituted jury could hear AM's and OP's testimonies. We review a court's denial of a motion for a mistrial for an abuse of discretion and will reverse only when "the trial court's determination is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 (quotation simplified). Similarly, the handling of a potentially incapacitated juror "is so peculiarly within the observation, province, and discretion of the trial court that we should not interfere with the ruling, except upon a clear abuse of discretion." *State v. Marquina*, 2018 UT App 219, ¶ 29, 437 P.3d 628 (quotation simplified), *cert. granted*, 440 P.3d 691 (Utah 2019). In other words, we will reverse a court's decision regarding a potentially incapacitated juror when, in light of the facts of the case, the "decision is beyond the limits of reasonability." *Id.* ¶¶ 29, 31 (quotation simplified).

¶20    Second, Gollaher argues that the jury instructions were erroneous because they did not require juror unanimity on each count. "A challenge to a jury instruction as incorrectly stating the law presents a question of law, which we review for correctness."[3] *State v. Maese*, 2010 UT App 106, ¶ 7, 236 P.3d 155 (quotation simplified).

---

3. The State contends that Gollaher's request that the jury instructions identify a specific touch and victim for each count of aggravated sexual abuse of a child did not preserve this issue because "he did not tell the court that his specific concern was that without that specificity, the instructions created a risk of unacceptable non-unanimity." We disagree. Gollaher's articulated concern, when highlighted by the prosecutor's

(continued…)

¶21 And third, he asserts that the trial court erred in permitting evidence of his prior child-molestation conviction to be presented to the jury through SCH's testimony instead of his offered stipulation. We review a trial court's evidentiary rulings for an abuse of discretion, and we "will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Tarrats*, 2005 UT 50, ¶ 16, 122 P.3d 581 (quotation simplified).

ANALYSIS

I. Potential Juror Incapacity

¶22 Gollaher contends that the trial court erred in denying his motion for a mistrial and in rejecting his request to conduct a more detailed inquiry into each juror's ability to hear witness testimony after two jurors alerted the court that they could not hear AM's and OP's testimonies. He asserts that by limiting its initial inquiry to the two jurors who professed to be unable to hear and by "vaguely" questioning the reconstituted jury "whether they were 'currently' suffering from any 'incapacity' or 'disability,' . . . the trial court abused its discretion and violated [his] rights to a fair trial and impartial jury." *See* U.S. Const. amend. VI; Utah Const. art. 1, § 12.

---

(…continued)

misstatement of law, prompted the court to give a third jury instruction on unanimity. Thus, Gollaher's unanimity concern clearly rose to the trial court's conscious attention. *See State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 (stating that for an issue to be preserved for appeal, it "must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority") (quotation simplified).

¶23 Gollaher asserts that the situation in this case is similar to that of a sleeping juror. We agree with that proposition. In such cases, trial courts "are given wide discretion in how to respond," with "the specific response depend[ing] on the facts of the case." *State v. Marquina*, 2018 UT App 219, ¶ 31, 437 P.3d 628, *cert. granted*, 440 P.3d 691 (Utah 2019). Furthermore, because there is no "rule or template trial courts must follow whenever they are confronted with" such situations, we will reverse only when the "decision is beyond the limits of reasonability." *Id.* ¶¶ 29, 31 (quotation simplified). *See also id.* ¶ 34 ("Utah law does not require a court to conduct sua sponte a voir dire after a report of a [potentially incapacitated] juror.").

¶24 Here, after receiving a request for transcripts of AM's and OP's testimonies because "2 of the jurors could not hear & there was no microphone," the trial court questioned the two jurors to gauge "the extent of the claimed incapacity to recall or understand the testimony." After the jurors' answers confirmed that they did not adequately hear the crucial testimony, the court denied Gollaher's mistrial motion, opting instead to dismiss the jurors and replace them with the two alternate jurors.[4] After

_____

4. Gollaher asserts that this action violated the version of rule 18(g) of the Utah Rules of Criminal Procedure in effect at the time, which provided that alternate jurors shall replace jurors who become incapacitated "*prior* to the time the jury retires to consider its verdict." *See* Utah R. Crim. P. 18(g) (2016) (emphasis added). In his reply brief, Gollaher clarified that he did not raise the rule violation "as an independent ground for reversal" but "to further show how the trial court bungled its treatment of that issue within its overall decision to decline a mistrial."

We note that rule 18 has since been amended to expressly permit alternates to replace jurors *after* deliberations have begun. *See id.* R. 18(f) (2020). The rule, however, still does not expressly permit courts to reseat alternates after they have been discharged. In any event, although Gollaher at an earlier point called the State's suggestion that the alternates replace the

(continued…)

ensuring that the alternates had not discussed the details of the case with anyone or expressed an opinion on the case following their dismissal, the court directed them to join the remaining jurors.

¶25 Finally, the court engaged in a comprehensive inquiry to ensure that the reconstituted jury would be able to begin deliberations anew and would not be affected by its reconstitution. Although Gollaher requested that the court specifically ask whether the reconstituted jury could adequately hear trial testimony, the court expressed concern about "suggesting potential disabilities" to the jury. Instead, it elected to make general inquiries into the jurors' capacities by asking, "Do any of you believe, based upon your entire experience in the trial, that you will have any disability from fully and fairly considering all of the evidence that was presented at the trial if

_____

(…continued)

dismissed jurors a "legal fiction" without reference to rule 18(g), he later expressed agreement with the court's recalling of the dismissed alternates, stating that his sole concern was the degree to which the reconstituted jury had been able to hear all material testimony. "Other than that, [he had] no objection." Accordingly, any challenge to this aspect of the court's treatment of the hearing issue is unpreserved, and because Gollaher does not ask us to review this issue pursuant to any of the exceptions to our preservation requirement, we do not address it further. *See State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 (stating that for an issue to be preserved for appeal, it "must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority") (quotation simplified); *In re A.T.I.G.*, 2012 UT 88, ¶ 21, 293 P.3d 276 ("To preserve an issue for appeal . . . (1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority. A party may not preserve an issue by merely mentioning it.") (quotation simplified).

you are asked again to deliberate in this matter?" and, "Are any of you currently acting or operating under any incapacity to fully and fairly consider all of the evidence that was presented?" Such a course of action is not one that is "beyond the limits of reasonability."[5] *See id.* ¶ 29 (quotation simplified).

¶26　As an initial matter, the original jury specifically advised the court that two jurors could not hear AM's and OP's testimonies. It was therefore reasonable for the court to ask only those two identified jurors regarding the extent to which they could hear the testimonies. After determining that they had not adequately heard material testimony, the court correctly dismissed the two jurors.[6] And in light of the court's concern

---

5. In so concluding, we do not mean to imply that dealing more directly with any auditory problems experienced by the reconstituted jury would have been problematic. It was no secret that there were significant sound problems during trial, given the background noise and the lack of quality amplification of witness testimony. Trial participants were frequently admonished to speak up, and the court apologized for the courtroom's deficiencies. Indeed, focusing more directly on that potential problem might well have been the better practice. Inquiring about possible sound and hearing problems would not have suggested a "disability" to the jurors of which they were not otherwise fully aware.

6. Gollaher likens his case to that of *State v. Turner*, 521 N.W.2d 148 (Wis. Ct. App. 1994), in which the Wisconsin Court of Appeals reversed some of the defendant's convictions because two jurors could not adequately hear material testimony. *Id.* at 150–52. *Turner* is distinguishable from the present case because, although the trial court in *Turner* determined through voir dire that two of the jurors did not hear all the testimony, it nonetheless *permitted* the two jurors to deliberate. *Id.* at 150. Based on those facts, the Wisconsin Court of Appeals determined that the defendant's "constitutional rights to an

(continued…)

about "suggesting potential disabilities" to the reconstituted jury, the court's approach to ask more general questions was understandable, even if not preferable.

¶27 Most importantly, although the court's questions were general in nature, they were sufficient to allow the jury to bring any further auditory issues to the court's attention. While not specifically referencing their ability to hear, the court did ask the jurors, with our emphasis, whether *based upon your entire experience in the trial*," they had "any disability from *fully* and fairly considering *all* of the evidence that was presented at the trial." Although Gollaher takes issue with the court's use of the word "disability," arguing that a juror's inability to hear on account of the problematic acoustics of the courtroom does "not constitute . . . a 'disability' at all," he overlooks that the court qualified the word with the phrase "based upon your entire experience in the trial." The court was clearly asking whether anything occurred during the trial that would prevent the jurors from "fully" considering "all" the evidence presented. Thus, if a member of the reconstituted jury was unable to hear all the trial testimony, the court's question would have prompted the juror to alert the court to that fact, especially on the heels of two jurors having just been excused because of articulated hearing problems.

¶28 Given the facts of this case, and given the wide discretion granted to trial courts to address potential juror incapacity, the trial court did not exceed its discretion when it elected not to conduct a more specific inquiry into the reconstituted jury's ability to hear material testimony.

---

(…continued)
impartial jury and due process were infringed when either one or two jurors were unable to hear the testimony of material witnesses." *Id.* at 151. With replacement of the two jurors who could not hear with alternate jurors, that is not what happened here.

¶29 Because the court handled the issue satisfactorily, it likewise did not exceed its discretion in denying Gollaher's motion for a mistrial. Specifically, because the court's investigation sufficiently addressed whether the reconstituted jury heard material testimony, we are not persuaded "that the incident so likely influenced the jury that [Gollaher] cannot be said to have had a fair trial."[7] *See State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 (quotation simplified).

## II. Unanimity Instructions

¶30 Gollaher argues that the two written unanimity instructions were erroneous because they "fail[ed] to require the jury to agree on which specific act [he] committed against which victim and then unanimously find that the elements of sexual abuse were met with respect to it." Although we agree that the written instructions inadequately informed the jury on unanimity, the court's oral instruction to the jury during closing argument filled in the necessary gaps. The court erred, however, in not subsequently providing this third unanimity instruction to the jury in written form. This lapse contravened rule 19(c) of the Utah Rules of Criminal Procedure. Nonetheless, under the facts of this case, we conclude that the error was harmless.

¶31 The Utah Constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. This requirement is met when a jury's verdict is unanimous "as to a specific crime." *State v. Hummel*, 2017 UT 19, ¶ 28, 393 P.3d 314 (quotation simplified). *See id.* ¶ 26 ("The Unanimous Verdict Clause requires unanimity as to each count of *each distinct crime charged* by the prosecution and submitted to the jury for decision.") (emphasis in original). In other words, it is

---

7. Gollaher also argues that the trial court's alleged errors were structural. *See State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543. Because we conclude that the trial court did not err in its investigation and denial of a mistrial, we do not reach this issue.

insufficient for a jury merely to find "that a defendant is guilty *of a crime*" and render "a generic 'guilty' verdict that does not differentiate among various charges." *Id.* ¶ 26 (emphasis in original) (quotation otherwise simplified). A verdict is also not unanimous where, for example, "some jurors found a defendant guilty of a robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though . . . all the jurors together agreed that he was guilty of some robbery." *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951. *See also Hummel*, 2017 UT 19, ¶ 65 (holding "that the constitutional requirement of unanimity is limited to those matters identified as *elements* of a crime in the substantive criminal law" and that alternative factual theories "of ways of fulfilling such elements, on the other hand, are not a necessary part of a verdict, and thus fall beyond the requirement of unanimity") (emphasis in original).

¶32 And as relevant here, where the State charges a defendant with multiple counts of a particular crime arising from a number of distinct criminal acts, "the jury must be unanimous as to which act or incident constitutes the charged crime." *State v. Case*, 2020 UT App 81, ¶ 21, 467 P.3d 893 (quotation simplified). Thus, to ensure unanimity in such multiple-acts cases, the jury instructions must either (1) link an alleged criminal act to a charge or (2) inform the jury that it must unanimously agree that the same alleged criminal act has been proven beyond a reasonable doubt. *See id.* ¶ 23; *State v. Alires*, 2019 UT App 206, ¶ 23, 455 P.3d 636 ("Where neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime."). *See also State v. Coleman*, 150 P.3d 1126, 1127 (Wash. 2007) (en banc) ("When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act.").

¶33   Here, the State alleged eight distinct touches prohibited under Utah Code section 76-5-404.1(2), but it charged Gollaher with only four counts of sexual abuse of a child. *See Alires*, 2019 UT App 206, ¶ 21 ("[E]ach unlawful touch of an enumerated body part (or each unlawful taking of indecent liberties) constitutes a separate offense of sexual abuse of a child under Utah Code section 76-5-404.1(2)."). The four identical elements instructions did not link each charge to a specific touching, or even a specific victim, and the written instructions that did address the unanimity requirement only generally provided that it was the jurors' duty "to consult with one another and to deliberate with a view to reaching a unanimous agreement, if [their] individual judgment allows such agreement," and that "[t]his being a criminal case, it requires a unanimous concurrence of all jurors (i.e., all voting the same) to find a verdict." The written instructions certainly did not inform the jury that it had to unanimously agree on a specific incident for each charge on which it convicted Gollaher. For these reasons, we agree that the written instructions inadequately informed the jury on the constitutional unanimity requirement.

¶34   Nevertheless, Gollaher is not entitled to the relief he seeks. Although the written instructions were deficient, the jury ultimately received proper instruction on the constitutional unanimity requirement via the trial court's aptly timed oral instruction. When the prosecutor, during closing argument, told the jury that it could "pick or choose" which four of the eight possible instances of prohibited touching it could convict Gollaher of without "necessarily hav[ing] to agree from juror to juror on the top four counts," clearly contradicting established law, *see Saunders*, 1999 UT 59, ¶ 60, the court correctly interjected as soon as the prosecutor finished addressing the jury. The court informed the jury that the prosecution had incorrectly stated the law and clarified that "[t]he jury must make a determination as to each count, and be able to find unanimously a specific instance that meets the criteria for the offense as to that count. . . . There must be identified instances on which the jurors unanimously agree for each offense charged." While the written

instructions did not adequately inform the jury of the constitutional unanimity requirement, this oral instruction cured that deficiency by ensuring that the jury understood that its verdict on each charge had to be truly unanimous, thus satisfying the constitutional unanimity requirement.[8] *See State v. Shickles*, 760 P.2d 291, 303 (Utah 1988) (Zimmerman, J., concurring) ("[W]hen a prosecutor makes a remark misstating the law, which may prejudice the jury, the proper procedure is for the trial court to give a clarifying instruction.").

¶35    But pursuant to rule 19(c) of the Utah Rules of Criminal Procedure, the court erred in not subsequently incorporating its oral instruction into the final written instructions that were presented to the jury at the end of trial. Rule 19 provides that "[f]inal instructions shall be in writing and at least one copy provided to the jury." Utah R. Crim. P. 19(c). As discussed above, the written instructions that informed the jury of the constitutional unanimity requirement were incomplete. The court's oral instruction, which notably did not contradict the written instructions,[9] cured the problems with the written

---

8. For this reason, the deficiency in the written instructions does not amount to constitutional error. Rather, as discussed below, the court erred in not including its oral instruction in the final version of the written instructions presented to the jury at the close of trial. This error implicates rule 19(c) of the Utah Rules of Criminal Procedure rather than the Utah Constitution. *See State v. Buttars*, 2020 UT App 87, ¶ 46, 468 P.3d 553 ("[M]ere violations of statutes [and rules] do not automatically rise to the level of a constitutional violation.").

9. Gollaher contends that the oral instruction contradicted the written instruction that informed the jurors that it was their duty "to consult with one another and to deliberate with a view to reaching a unanimous agreement, if [their] individual judgment allows such agreement." He argues that "[b]y instructing the jury that its duty was to deliberate 'with a view' to being

(continued…)

unanimity instructions. Thus, although the jury was ultimately properly instructed on unanimity, thereby satisfying the constitutional requirement, the court violated the rule by not including its supplemental oral instruction in the final written instructions. But under the facts of this case, the error was harmless. *See State v. Cruz*, 2016 UT App 234, ¶ 41, 387 P.3d 618.

¶36 "An error is harmless if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Alires*, 2019 UT App 16, ¶ 23, 438 P.3d 984 (amended opinion) (quotation simplified). *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). We conclude, under the facts of this case, that the court's rule violation was harmless.

¶37 Gollaher contends that the oral instruction carried little weight with the jury because it "was significantly divorced both conceptually and temporally from the written instructions." We might be inclined to agree if the instruction had been given in an inconspicuous or passing manner. But the manner in which the

_____

(…continued)

unanimous but only '*if* your individual judgment allows such agreement,' [the instruction] suggested that unanimity was something the jury should aspire to but not necessarily achieve." But individual instructions must be viewed "within the context of the jury instructions as a whole." *See State v. Kennedy*, 2015 UT App 152, ¶ 24, 354 P.3d 775. Even assuming that jurors might interpret that instruction in such a manner, which is unlikely, the second written instruction addressing unanimity rid the jurors of any such notion. It provided, with our emphasis, that "[t]his being a criminal case, it *requires* a unanimous concurrence of all jurors (i.e., all voting the same) to find a verdict." Thus, because the written instructions did not inform the jury that a unanimous verdict was optional, the oral instruction could not contradict the written instructions in the manner that Gollaher asserts.

court delivered the oral instruction in this case heightened its prominence and ensured that it stood out to the jury. After the prosecutor concluded his closing argument, the court informed the jury, sua sponte, that the prosecutor had made "an incorrect statement of the law during [his] argument." Such a statement pointing out an unqualified legal error on the prosecutor's part would surely stand out in the minds of the jurors. Additionally, the oral instruction was not fleeting, as Gollaher asserts it to be. The court first instructed that "[t]he jury must find unanimously four separate instances, specifically as provided by the instructions." Before clarifying the law on unanimity, it first told the jury what it could not do: "It is not appropriate for each juror to independently determine whether there are some number of offenses and then aggregate that determination." The court then continued:

> The jury must make a determination as to each count, and be able to find unanimously a specific instance that meets the criteria for the offense as to that count.
>
> If such a unanimous determination cannot be made as to four separate instances, then whatever number or no instances that are determined unanimously will control the jury's verdict. There must be identified instances on which the jurors unanimously agree for each offense charged.

Although the court was required by rule 19(c) to include a version of the oral instruction in the final written instructions, the court ensured that the jury understood the correct standard through its oral instruction by repeating the standard more than once and doing so in the express context of correcting the prosecutor's misstatement of law.

¶38    Gollaher also argues that "[t]he jury was not instructed to use the trial court's oral statement prospectively to interpret

subsequently-issued written instructions in light of it." But by stating that "[t]he jury must find unanimously four separate instances, specifically as provided by the instructions," before proceeding to clarify the unanimity requirement, the court did connect the written instructions with its oral instruction. And in any event, "jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *State v. Hutchings*, 2012 UT 50, ¶ 25, 285 P.3d 1183 (quotation simplified). Rather, they apply a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* (quotation simplified). *See also State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887 ("In the absence of any circumstances suggesting otherwise, courts presume that the jury follows [curative] instructions."). Accordingly, where the oral instruction did not contradict the written instructions, the jurors are presumed to have used the oral instruction to fill in the gaps in the written instructions.

¶39 We conclude that there was no "reasonable likelihood that the error" of not including the oral instruction in the final version of the written instructions "affected the outcome of the proceedings." *See Alires*, 2019 UT App 16, ¶ 23 (quotation simplified).

### III. SCH's Testimony

¶40 Finally, Gollaher argues that the trial court erred in permitting SCH to testify instead of accepting his stipulation to introduce his prior conviction without that testimony. Generally, "a party may not preclude his adversary's offer of proof by admission or stipulation." *State v. Florez*, 777 P.2d 452, 454 (Utah 1989) (quotation simplified). *See also State v. Verde*, 2012 UT 60, ¶ 28, 296 P.3d 673 ("[T]he prosecution retains wide discretion to reject [stipulations.]"), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *State v. Johnson*, 2016 UT App 223, ¶ 37, 387 P.3d 1048 ("[S]tipulating to a fact does not cut off the State's right to present evidence depicting the context of that fact."). But "the State is bound to stipulate to facts, to use an

alternative mode of proof, or to forego introduction of the material if the evidence it offers cannot satisfy rule 403" of the Utah Rules of Evidence. *Florez*, 777 P.2d at 455 (quotation simplified). Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." Utah R. Evid. 403.

¶41 Although Gollaher "concedes that evidence of his prior conviction, offered in the proper form, would have been admissible under rules 404(c) and 403," he contends that the manner in which it was presented to the jury failed the rule 403 balancing test. He contends that in light of his offered stipulation, the risk of unfair prejudice substantially outweighed the probative value of SCH's testimony because her testimony "had 'no legitimate value' beyond what could be inferred from a stipulation," *see Verde*, 2012 UT 60, ¶ 29, and, this being a prior child molestation conviction, it was inevitable that her testimony would be "emotionally charged" and that it would "unfairly arouse the jury's sympathies in a manner that a stipulation would not have."

¶42 Because Gollaher did not make this argument to the trial court, the issue was not preserved. "In order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on the issue." *State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 (quotation simplified). In other words, "the issue must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority." *Id.* (quotation simplified). Gollaher did not meet this requirement here. His objection to SCH's testimony at trial was limited to his concern that it might go "outside of anything which was not discussed in the 1996 case," specifically "that the State is going to try to bring in additional peripheral things that are not in the record" in violation of rule 404(c) of the Utah Rules of Evidence. Gollaher asserts that "the obvious implication of his point was

broader: that such testimony would be unfairly prejudicial." We disagree.

¶43 A review of the record reveals that Gollaher was clearly concerned that the content of SCH's testimony would go beyond the scope of the facts of his prior conviction and not that her testimony would unnecessarily inflame the jury's emotions, implicating rule 403. As part of his objection, Gollaher claimed that SCH had "testified in a [different] case to matters that are outside" of his 1996 conviction and requested that the court allow him to read into the record the court's pre-trial ruling on the matter in which it limited SCH's testimony to "the introduction of the conviction and the summary of the facts supporting the conviction, but no more." Such a request clearly demonstrates that Gollaher was specifically concerned that SCH would testify to certain *irrelevant* facts. And although he referred to rule 404(c), he never once raised a concern that her testimony would inflame the jurors' emotions, thereby implicating rule 403. Accordingly, we have no rule 403 analysis from the trial court to review. *See Thornton*, 2017 UT 9, ¶ 56 ("The trial judge is in a better position than we are to assess the avowed basis for evidence of prior misconduct—and to judge its likely effect in prejudicing or confusing the jury. So the question for us is not whether we would have admitted this evidence. It is whether the district judge abused his broad discretion in doing so.").

¶44 Gollaher thus did not "sufficiently raise[]" the argument he now asserts on appeal "to a level of consciousness before the trial court," much less support his argument by "relevant legal authority." *See Sanchez*, 2018 UT 31, ¶ 30 (quotation simplified). And because Gollaher has not argued this issue through the lens of plain error, we have no occasion to further address it.[10] *See State v. Murphy*, 2019 UT App 64, ¶ 16, 441 P.3d 787.

---

10. In so noting, we do not mean to suggest that the claimed error would have satisfied the rigorous requirements of the plain

(continued…)

CONCLUSION

¶45    The trial court did not exceed its discretion by denying Gollaher's motion for a mistrial and conducting a general inquiry into the reconstituted jury's capacity to fully consider all evidence presented at trial. The court properly corrected any error in the written jury instructions through its later oral instruction, and its error in not including its oral instruction in the final version of the written instructions was harmless. Lastly, Gollaher did not preserve his argument challenging SCH's testimony at trial.

¶46    Affirmed.

_____

(…continued)
error doctrine, *see generally State v. Johnson*, 2017 UT 76, ¶¶ 20–21, 416 P.3d 443, or that appellate counsel's forgoing the effort was anything other than a sensible strategic decision.