2026 UT App 3

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANIEL STANISLAV MACBETH,
Appellant.

Opinion
No. 20230512-CA
Filed January 15, 2026

Fourth District Court, Provo Department
The Honorable Robert C. Lunnen
No. 211402124

Freyja Johnson and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Rebecca Barker,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER concurred.

LUTHY, Judge:

¶1　Daniel Stanislav MacBeth ran a red light, striking another vehicle in the intersection and killing its driver. MacBeth was subsequently convicted of manslaughter. He now asks us to reverse his conviction, asserting that the district court gave the jury an erroneous instruction regarding what it means to act "recklessly" for purposes of manslaughter. MacBeth also asserts that his trial counsel (Counsel) provided ineffective assistance by not opposing the State's proposed jury instruction on the elements of manslaughter.

¶2 We agree with MacBeth that the district court provided the jury with an erroneous definition of what it means to act "recklessly" in the context of manslaughter. But we conclude that neither the district court's error nor Counsel's assertedly deficient performance prejudiced MacBeth's defense, and we therefore affirm his conviction.

## BACKGROUND[1]

### *The Accident and the Charges*

¶3 On May 25, 2021, an off-duty law enforcement officer (Officer) was driving west on State Route 194 toward Saratoga Springs in an unmarked Dodge Ram truck. As he drove, he noticed a "small white vehicle"—whose driver and sole occupant turned out to be MacBeth—"following . . . closely behind" him. MacBeth was so close that Officer "couldn't see the hood of [MacBeth's] vehicle" in his rearview mirror. Officer and MacBeth both came to the intersection at Redwood Road, turned left onto Redwood Road, and then proceeded south in the left-most lane. MacBeth was "still . . . traveling very closely" behind Officer, who was going about fifty miles per hour, the posted speed limit.

¶4 At this point, Officer twice "stepped on [his] brakes to brake check [MacBeth], to give a hint that [he was] too close." After Officer brake checked MacBeth the second time, MacBeth "made an abrupt right lane change," sped up until he was "parallel with [Officer's] vehicle," "put out his left arm" and "flipped [Officer] off, and then accelerated again." MacBeth then

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Hosman*, 2021 UT App 103, 496 P.3d 1162 (cleaned up).

changed lanes to the left, in front of Officer, accelerated once more, flipped Officer off again, and "kept going." Officer, who had training and years of experience pacing cars to monitor for speeding, estimated that by this time MacBeth was traveling seventy to ninety miles per hour toward the intersection at Harvest Hills Boulevard. Officer then "saw the light at the intersection turn red" and watched as MacBeth "disregarded" the red light and entered the intersection.

¶5 During this same time, another southbound driver on Redwood Road (Driver 1) was in the right lane with her toddler son and was also approaching the intersection at Harvest Hills Boulevard. Driver 1 began to slow down because the light at the intersection had turned yellow. While she was slowing, she heard the sound of a vehicle accelerating loudly behind her. She looked in her rearview mirror and saw a "speeding" car—the one driven by MacBeth—approaching her from behind. She then watched as MacBeth "change[d] lanes quickly to the left" and "drove by [her] very quickly." She said to her son, "There goes another speeder who's going to run a red light." As she said this, she saw MacBeth "run the red light."

¶6 An additional southbound driver in the right lane on Redwood Road (Driver 2) also watched MacBeth run the red light at the intersection at Harvest Hills Boulevard. Like Driver 1, Driver 2 "noticed [when] the light started to change from green to yellow," so he "started slowing down." As he did, he heard MacBeth's "loud" car approaching from behind, looked in his rearview mirror, and saw MacBeth "coming up pretty hard [in] . . . the left lane." When MacBeth passed him, Driver 2 saw that MacBeth "was just focused" and "trying to hit the light." According to Driver 2, MacBeth did not "hit [his] brakes" but, instead, "just kept going faster" as he entered the intersection, where the light had been red "[f]or a good two seconds."

¶7     Meanwhile, a teenage driver (Victim) in a northbound vehicle on Redwood Road had stopped at the same intersection, waiting to turn left. After Victim's light turned red—or a fraction of a second before it did—Victim started to turn and was struck by MacBeth, who was speeding the other direction through the red light. The two cars "slam[med] into the retaining wall" on the west side of the road. Driver 1 "immediately called 911," thinking the accident looked like one that "would kill someone." Officer radioed the highway patrol, telling it to dispatch "Saratoga Springs units and the fire department."

¶8     Although paramedics arrived and provided life-saving efforts to Victim, he died at the scene. MacBeth was shaken up but not seriously injured in the crash. He was subsequently charged with being an alcohol restricted driver, driving with a measurable controlled substance in his body, driving on a suspended license, and manslaughter. He pled guilty to all of these charges except manslaughter. A trial was held on the manslaughter charge.

*The Trial*

¶9     At trial, Officer, Driver 1, Driver 2, a paramedic who responded to the scene, and a police officer assigned to the accident investigation team testified for the State, relating the facts outlined above.

¶10    The State also called a number of additional witnesses, including the traffic signal operations engineer for the Utah Department of Transportation (UDOT), who testified that after reviewing data from sensors at the intersection where the crash occurred, he determined that both MacBeth and Victim ran a red light. A crash investigator who reviewed data and attempted to reconstruct the accident testified that he believed Victim entered the intersection "a fraction of a second prior to [the light] turning red" and MacBeth entered the intersection "[m]ore than a fraction of a second after the light turned red." Two people who spoke

with MacBeth at the scene testified that he told them the light was yellow when he entered the intersection.

¶11 Additionally, the State called a patrol officer assigned to the accident investigation team, who testified that based on his examination of the speedometer in Victim's vehicle, Victim was traveling about eighteen miles per hour when the collision occurred. The State also called a crash reconstruction expert, who, relying on evidence from the crash, estimated that MacBeth was traveling ninety-four miles per hour just before he hit Victim. While no additional witnesses for the State estimated the specific speed at which MacBeth or Victim was traveling, one motorist who was approaching the intersection from the south at the time of the accident testified that she observed a "super loud blur" just prior to the crash. Another such motorist testified that the first thing she saw was Victim's car and MacBeth's car "flying through the air" after the crash. And an additional northbound motorist testified that he saw MacBeth "coming southbound . . . at a very high rate of speed"—"much faster than any other vehicle" "[i]n the vicinity"—right before the crash.

¶12 MacBeth called a single witness, an officer who "conducted a major crash vehicle inspection" of MacBeth's car. That officer testified that MacBeth did not have "any obvious distractions within the vehicle" at the time of the crash. MacBeth did not testify.

*The Jury Instructions*

¶13 The State proposed and Counsel agreed to the jury instruction on the elements of manslaughter, which stated in relevant part as follows:

> [MacBeth] is charged in Count 1 with committing Manslaughter on or about May 25, 2021. You cannot convict him of this offense unless, based on the

evidence, you find beyond a reasonable doubt each of the following elements:

    1. [MacBeth],

    2. While acting recklessly,

    3. Caused the death of [Victim].

¶14    The State and Counsel could not agree on an instruction defining the mental state required for manslaughter. The State proposed the following instruction, the first sentence of which exactly tracks the definition given in section 76-2-103(3) of the Utah Code:

> A person engages in conduct "recklessly" with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The nature and extent of the risk must be of such a magnitude that disregarding it is a gross deviation from what an ordinary person would do in that situation.

MacBeth, on the other hand, proposed the following instruction:

> A person acts "recklessly" when he is aware of a substantial and unjustifiable risk that his conduct will cause a particular result, but he consciously disregards the risk and acts anyway. The nature and extent of the risk must be of such magnitude that disregarding it is a gross deviation from what an ordinary person would do in that situation.

The court determined that it would be "safer staying with the statute" and gave the State's proposed instruction.

¶15    The jury convicted MacBeth of manslaughter, and MacBeth now appeals.


ISSUES AND STANDARDS OF REVIEW

¶16    MacBeth raises two issues on appeal. First, he asserts that the district court "erroneously instruct[ed] the jury on a definition of 'recklessly' that is not applicable to manslaughter." Our supreme court recently clarified "that the applicable standard of review for jury instruction issues should be determined as it is for any other issue on appeal," meaning that, "in general, the standard of review is based on the nature of the issue on appeal." *State v. Hunt*, 2025 UT 54, ¶ 43 (cleaned up). For example, "a district court generally has discretion in deciding how it will instruct a jury at trial, as jury instructions require no particular form so long as they accurately convey the law." *Id.* ¶ 45 (cleaned up). Thus, "if the jury instructions are legally correct, the precise wording and specificity of jury instructions is left to the sound discretion of the trial court." *Id.* (cleaned up). On the other hand, "if a criminal defendant asserts that the district court . . . gave a legally incorrect instruction," then the issue is a question of law, the standard of review for which is correctness. *Id.* ¶ 46. Here, because MacBeth asserts that the district court gave a legally incorrect instruction, the issue he raises presents a question of law, which we review for correctness. *See id.*

¶17    Second, MacBeth asserts that Counsel rendered ineffective assistance by agreeing to the State's proposed jury instruction on the elements of manslaughter. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Miller*, 2023 UT App 85, ¶ 22, 535 P.3d 390 (cleaned up).

ANALYSIS

I. Jury Instruction on the Mental State for Manslaughter

¶18    To be convicted of the version of manslaughter with which MacBeth was charged, a person must have "recklessly cause[d] the death of another individual." Utah Code § 76-5-205(2)(a). MacBeth contends that the district court "erroneously instruct[ed] the jury on a definition of 'recklessly' that is not applicable to manslaughter." We agree but determine that this error was harmless in this case.

¶19    Section 76-2-103(3) of the Utah Code defines what it means for a person to have the mental state of recklessness for purposes of criminal liability. It states,

> A person engages in conduct . . . [r]ecklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Utah Code § 76-2-103(3).

¶20    The first sentence of section 76-2-103(3) contemplates that for some crimes a mental state of recklessness exists if the actor "is aware of but consciously disregards a substantial and unjustifiable risk that [particular] circumstances [surrounding the actor's conduct] exist." *Id.* An example of such a crime is the offense of leaving a child unattended in a motor vehicle. *See id.* § 76-5-115. That crime is committed with a reckless mental state

when an actor recklessly "leaves a child in an enclosed compartment of a motor vehicle," the vehicle is on "public property" or "private property that is open to the general public," "the child is not supervised by an individual who is at least nine years old," and "the conditions present a risk to the child of: (i) hyperthermia; (ii) hypothermia; or (iii) dehydration." *Id.* § 76-5-115(2). The actor has the requisite mental state for the last element of this crime, for example, if the actor is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances present a risk to the child of hyperthermia, hypothermia, or dehydration. *See id.* §§ 76-2-103(3), -115(2). The actor need not recklessly *cause* hyperthermia, hypothermia, or dehydration; instead, it is sufficient that the actor engages in conduct recklessly with respect to the circumstances surrounding the actor's conduct. *See id.*

¶21 Contrastingly, section 76-2-103(3) also contemplates that for other crimes a mental state of recklessness exists if the actor "is aware of but consciously disregards a substantial and unjustifiable risk that . . . [a particular] result will occur" because of the actor's conduct. *Id.* § 76-2-103(3). One such crime is the version of manslaughter with which MacBeth was charged. *See id.* § 76-5-205(2)(a). As already noted, an actor commits manslaughter when the actor "recklessly causes the death of another individual." *Id.* Thus, for an actor to have the requisite mental state for this crime, the actor must be aware of but consciously disregard a substantial and unjustifiable risk that the death of another individual will result from the actor's conduct. *See id.* §§ 76-2-103(3), 76-5-205(2)(a).

¶22 In short, "[s]ome crimes or elements [of a crime] with a mens rea of 'recklessly' require [only] that the defendant recklessly engages in conduct, while others require that the defendant recklessly causes a result." Model Utah Jury Instructions 2d CR304A committee's note to the 2015 amendment, https://legacy.utcourts.gov/MUJI/?cat=2 [https://perma.cc/6CQZ-

4CQ6]. Because our criminal code contemplates two different ways in which a person may have the mental state of recklessness, depending on the crime or element at issue, "[j]urors must be specifically instructed as to the definition of 'recklessly' [that] applies to the crime(s) or element(s) they are considering." *Id.* And "[i]f the jury is considering more than one count with a mens rea of 'recklessly,' and if a single definition does not cover all counts, then the jury must be instructed as to which definition applies to each count." *Id.*[2]

¶23  Here, rather than instruct the jury as to the specific definition of "recklessly" that applied to the crime at issue, the district court instructed the jury as to two possible definitions of "recklessly" without specifying which one the jury was to apply. This was error. Although the court's instruction tracked the language of the relevant statute, that approach was problematic in this context where the statute contained multiple definitions, only one of which applied to the crime at issue. Because under one of those definitions the jurors might have believed they could convict MacBeth if they found that he was aware of but consciously disregarded a substantial and unjustifiable risk that some (unidentified) circumstance existed, without finding that he was aware of but consciously disregarded a substantial and unjustifiable risk that another person's death would occur because of his conduct, the instruction was erroneous.

¶24  Nevertheless, we conclude that this error was harmless in this case. "An error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the

---

2. While Utah's model jury instructions "are merely advisory and do not necessarily reflect correct statements of Utah law," *C.R. Eng. v. Swift Transp. Co.*, 2019 UT 8, ¶ 34 n.59, 437 P.3d 343 (cleaned up), the committee's notes that we have quoted aptly and correctly state the relevant law.

proceedings." *State v. Zimpfer*, 2024 UT App 136, ¶ 58, 558 P.3d 111 (cleaned up). In other words, "the likelihood of a different outcome absent the error must be sufficiently high to undermine confidence in the verdict." *Id.* (cleaned up). Our confidence in the verdict here is not undermined by the erroneous definition of "recklessly" that was given to the jury.

¶25 The jury heard Officer, Driver 1, and Driver 2 each testify that they saw the traffic light turn red before MacBeth entered the intersection. The jury also heard both UDOT's traffic signal operations engineer and a crash investigator opine that the light was red before MacBeth entered the intersection. The only contrary evidence on this point was MacBeth's reported statements to people at the scene that the light was yellow.

¶26 Moreover, the jury heard Officer testify—based on his law enforcement training and years of experience—that MacBeth was traveling seventy to ninety miles per hour when he entered the intersection. The jury heard a crash reconstruction expert estimate that MacBeth was traveling ninety-four miles per hour just before he hit Victim. It heard from multiple eyewitnesses who generally corroborated the experts' estimates by testifying variously that MacBeth was "coming up pretty hard"; that he was traveling at a "very high rate of speed," "much faster than any other vehicle" "[i]n the vicinity"; that he "just kept going faster" as he entered the intersection; and that he appeared as a "super loud blur." Finally, the jury heard another eyewitness testify that Victim's car and MacBeth's car went "flying through the air" as a result of the crash.

¶27 "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *State v. Gollaher*, 2020 UT App 131, ¶ 38, 474 P.3d 1018 (cleaned up). "Rather, they apply a commonsense understanding of the instructions in the light of all that has taken place at trial." *Id.* (cleaned up). Considering these realities and the

compelling evidence that MacBeth ran a red light in traffic while traveling roughly ninety miles per hour, there is no reasonable probability that the jury—which plainly found that MacBeth was aware of and consciously disregarded a substantial and unjustifiable risk—did not also believe that the substantial and unjustifiable risk that MacBeth disregarded was the risk of causing another person's death.

¶28    In sum, the error in the court's definition of what it means to act recklessly for purposes of manslaughter was harmless in light of the evidence in this case. Thus, the error provides no basis for us to overturn MacBeth's conviction.

## II. Ineffective Assistance of Counsel

¶29    MacBeth also asserts that Counsel provided ineffective assistance by failing to insist on a proper instruction on the elements of manslaughter. Because we see no prejudice to MacBeth from Counsel's performance, MacBeth's ineffective assistance of counsel claim also fails.

¶30    To establish a successful ineffective assistance claim, MacBeth must demonstrate that (1) "Counsel's performance was deficient" and (2) Counsel's deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (cleaned up). "Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *State v. Nunes*, 2020 UT App 145, ¶ 18, 476 P.3d 172 (cleaned up). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. Here, we limit our analysis to prejudice and determine that MacBeth has failed to show he was prejudiced by Counsel agreeing to the instruction on the elements of manslaughter that was given to the jury.

¶31 The jury was instructed that to find MacBeth guilty of manslaughter, it had to find that "[w]hile acting recklessly," he "[c]aused the death of [Victim]." This instruction misstated the law because it allowed the jury to convict MacBeth if it found that he acted recklessly in one way but caused Victim's death in some other, non-reckless way. *See* Utah Code § 76-5-205(2)(a) ("[A]n actor commits manslaughter if the actor *recklessly causes* the death of another individual . . . ." (emphasis added)).

¶32 The fact that Counsel did not object to an elements instruction that misstated the law does not necessarily mean that Counsel performed deficiently. *See State v. Bonds*, 2023 UT 1, ¶ 43, 524 P.3d 581 ("Just because a legal error existed . . . does not necessarily mean that defense counsel's failure to object to the error amounted to deficient performance." (cleaned up)). And in this instance we need not decide whether Counsel's failure to object constituted deficient performance because, in any event, MacBeth's defense was not prejudiced by the faulty instruction.

¶33 Again, the jury heard compelling evidence that MacBeth entered the intersection on a red light in traffic while traveling at upwards of ninety miles per hour. It found that MacBeth's conduct was reckless. And it found that MacBeth caused Victim's death. Because there is no evidence that any conduct of MacBeth caused Victim's death other than MacBeth's entering the intersection on a red light at high speed, there is no reasonable probability that the faulty elements instruction made any difference in the jury's verdict.

¶34 MacBeth resists this conclusion by arguing that he "simultaneously committed multiple acts while driving and engaging in the collision, and the evidentiary picture supports [a determination] that jurors may have differed on which acts they found to be reckless and which acts they found to be a cause of [Victim's] death." For example, MacBeth asserts that "while some jurors may have viewed [his] speeding as reckless, and some

jurors may have viewed his speeding as a cause of [Victim's] death, other jurors may have had reasonable doubt that [MacBeth] was reckless in speeding through the intersection under the circumstances or that speeding caused [Victim's] death." However, we believe there is no reasonable likelihood that any juror thought running a red light in traffic at seventy to ninety-four miles per hour in a fifty mile per hour speed zone was not reckless. We also believe there is no reasonable likelihood that any juror drew a line between MacBeth's speeding and his running of the red light and thought only one was reckless and only the other caused Victim's death.

¶35   In sum, MacBeth has not shown that he was prejudiced by Counsel's failure to object to the faulty elements instruction. Accordingly, his ineffective assistance of counsel claim fails.

CONCLUSION

¶36   The district court gave an erroneous jury instruction on what it means to act "recklessly" for purposes of manslaughter. However, that error was harmless because it did not prejudice MacBeth's defense. The court also gave an erroneous instruction on the elements of manslaughter to which Counsel did not object. But even if that failure amounted to deficient performance (an issue we need not decide), that deficient performance did not prejudice MacBeth's defense. Thus, MacBeth's ineffective assistance of counsel claim fails. For these reasons, we affirm MacBeth's conviction.

───────────